JAMES PATRICK SHEA, ESQ.
Nevada Bar No. 405
SCOTT D. FLEMING, ESQ.
Nevada Bar No. 5638
ARMSTRONG TEASDALE LLP
3770 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Telephone:  702.678.5070
Facsimile:  702.878.9995
Email: jshea@armstrongteasdale.com
        sfleming@armstrongteasdale.com

*Counsel for Intesa Sanpaolo, S.p.A*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>HELI USA AIRWAYS, INC.,<br><br>          Debtor. | Case No.: 13-19083-BTB<br>Chapter 11<br><br>**INTESA SANPAOLO, S.P.A.'S OPPOSITION TO DEBTOR'S EMERGENCY MOTION FOR ORDER: (I) AUTHORIZING DEBTOR TO PAY WAGES, SALARIES, BENEFITS, AND OTHER EMPLOYEE OBLIGATIONS; AND (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**<br><br>Date:  November 13, 2013<br>Time: 1:30 p.m. |

Intesa Sanpaolo, S.p.A. ("Intesa") is an international bank headquarted in Turin, Italy with offices in New York and London.  On or about April 12, 2012, Intesa financed a purchase by Heli USA Airway, Inc. ("Debtor") of two Augusta Aerospace Corporation model AW119 MKII helicopter airframes bearing Federal Aviation Administration registration numbers N191NT and N192NT, together with two Pratt & Whitney Canada model PT6B-37A aircraft engines bearing serial numbers PCE-PU0165 and PCE-PU0170, two auxiliary power units ("APU") and certain aircraft parts (collectively, the "Aircraft").  Intesa's security interest in each Aircraft is set forth in a *Mortgage, Security Agreement and Assignment* (each, a "Security Agreement"), copies of which are attached as **Exhibits 1** and **2**.  Each Security Agreement includes, among other things, the following:  "all proceeds of any of the foregoing, whenever acquired, including, but not limited to,

1

the proceeds of any insurance maintained with respect to any of the foregoing. . ." Intesa thus holds a cash collateral interest in income generated by the Aircraft.

Intesa objects to the *Emergency Motion for Order: (I) Authorizing Debtor to Pay Wages, Salaries, Benefits, and Other Employee Obligations; and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligation* [Docket #27] (the "Motion") on the following grounds:

1.      **Debtor Has Failed to File Statements and Schedules**. As of the date of the filing of this opposition ("Opposition"), Debtor has not filed statements and schedules or a statement of financial affairs. Intesa has no way of knowing whether Debtor has sufficient income to continue operations. No replacement lien or other adequate protection of Intesa's interest has been offered by Debtor, and Intesa has no way of knowing whether the use of cash to pay employees will simply delay the imminent failure of the business. Intesa has requested a budget showing how its cash collateral would be used, but none has been provided.

2.      **Debtor Has Failed to Describe Employee Functions**. Debtor has attached as Exhibit A to the *Omnibus Declaration of Nigel Turner in Support of Debtor's First Day Motions* [Docket #30] a list of 53 employees for whom it seeks authority to pay nine (9) days of pre-petition wages. There is no discussion, however, regarding the services that any of these employees provided or whether these persons remain employed by Debtor. Based on other filings in this case, it appears that at least two (2) of Debtor's five (5) aircraft are grounded because engines have not been returned by Pratt & Whitney. It is not clear whether Debtor should continue operating with what is presumably a full complement of employees given the status of its aircraft, particularly where there is absolutely no information regarding its financial condition.

3.      **Debtor's Request to Pay Nigel Turner Should Be Denied**. As part of its Motion, Debtor seeks Court authority to pay its President and CEO Nigel Turner $8,055.44 for the nine (9) day period ending October 31. There is no discussion of what services Mr. Turner is providing or how he is normally compensated. As President and CEO, Mr. Turner would presumably have some role in the preparation of statements and schedules, but none have yet been filed. Moreover, there is no discussion of whether Mr. Turner holds an equity position in Debtor and thus whether some of his

compensation would be more properly characterized as an equity distribution.  Intessa respectfully submits that absent complete financial disclosures, no insider equity holders should be taking any funds from cash collateral.

Based on the foregoing, Intesa respectfully requests that the Motion be denied, and for such other relief as is just and proper.

DATED: November 12, 2013                 ARMSTRONG TEASDALE LLP


By: */s/ Scott D. Fleming*
JAMES PATRICK SHEA, ESQ.
Nevada Bar No. 405
SCOTT D. FLEMING, ESQ.
Nevada Bar No. 5638
ARMSTRONG TEASDALE LLP
3770 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169

# EXHIBIT "1"

# EXHIBIT "1"

# MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT

Dated as of April 12, 2012

between

## HELI USA AIRWAYS INC.

as the Grantor

and

## INTESA SANPAOLO S.P.A.

as the Secured Party

<u>MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT</u>

THIS MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT, dated as of April 12, 2012 is between HELI USA AIRWAYS INC., a Nevada corporation (hereinafter referred to as the "**Grantor**"), and INTESA SANPAOLO S.P.A., a company incorporated in Italy, operating through its New York Branch in its capacity as Lender, through its London Branch in its capacity as SACE Agent, and through its Milan Branch in its capacity as Arranger (the "**Secured Party**").

<u>R E C I T A L S</u>

A.    Pursuant to a SACE Facility Agreement dated as of March 28, 2012 (together with all amendments, modifications and supplements thereto, if any, the "**Facility Agreement**") between the Grantor and the Secured Party, the Secured Party has agreed to make a term Loan to the Grantor ("**Loan A1**").

B.    As a condition precedent to the making of Loan A1 under the Facility Agreement, the Grantor is required to execute and deliver this Agreement.

C.    Grantor is duly authorized to execute, deliver and perform this Agreement.

NOW, **THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce the Secured Party to make Loan A1 pursuant to the Facility Agreement, the Grantor agrees, for the benefit of the Secured Party, as follows:

## ARTICLE 1

## DEFINITIONS

**SECTION 1.1    <u>Definitions</u>.**    In this Agreement, unless the context otherwise requires, the terms defined herein and in any agreement executed in connection herewith include, where appropriate, the plural as well as the singular and the singular as well as the plural. Except as otherwise indicated, all agreements defined herein refer to the same as from time to time amended or supplemented or the terms thereof waived or modified in accordance herewith and therewith. Unless otherwise defined herein, capitalized terms used herein shall have the meanings given thereto in the Facility Agreement. The following terms shall have the respective meanings set forth below:

"**Act**" means the Federal Aviation Act of 1958, as amended from time to time and recodified in Subtitle VII of Title 49 of the United States Code.

"**Administrator**" means the Person designated to act on behalf of the Grantor in accordance with the Cape Town Convention.

"**Agreement**", "**this Agreement**", "**hereby**", "**herein**", "**hereof**", "**hereunder**" or other like words means this Mortgage, Security Agreement and Assignment, as it may be amended, modified or supplemented from time to time.

"**Aircraft**" means the Airframe, together with the Engines initially installed on such Airframe when delivered to the Grantor (or any replacement Engine substituted for any of such Engines hereunder), whether or not any such initial or replacement Engines may from time to time thereafter be installed on such Airframe or may be installed on any other airframe or on any other aircraft, and all Parts, including avionics, any APU and related equipment, manuals and logs.

"**Aircraft Protocol**" means the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on 16 November 2001 at a diplomatic conference held in Cape Town, South Africa as the same may be amended or modified from time to time.

"**Airframe**" means (i) the Agusta Aerospace Corporation model AW119 MKII aircraft (excluding the Engines or engines from time to time installed thereon) bearing United States Federal Aviation Administration Registration Number N191NT and manufacturer's serial number 14756 and (ii) any and all Parts so long as the same shall be incorporated in such aircraft and any and all Parts removed from such aircraft so long as such Parts shall remain subject to this Agreement and the Lien hereof in accordance with the terms of Section 3.5. The Airframe is type certified by the FAA to transport at least five people (including crew) or goods in excess of 450 kilograms.

"**Applicable Law**" shall mean all applicable laws, statutes, treaties, conventions, judgments, decrees, injunctions, writs and orders of any court, governmental agency or authority and rules and regulations, orders, directives, licenses and permits of any governmental body, instrumentality, agency or authority as amended and revised, and any judicial or administrative interpretation of any of the same, including the airworthiness certificate issued with respect to the Aircraft, the Cape Town Convention, the UCC, the Transportation Code, all FARs, airworthiness directives, taxes and other impositions, and/or any of the same relating to the Collateral generally or noise, the environment, national security, public safety, insurance, exports or imports or contraband.

"**APU**" means (i) any auxiliary power unit installed on the Airframe as of the Closing Date, whether or not hereafter installed on the Airframe or any other airframe from time to time; (ii) any auxiliary power unit that may from time to time be substituted, pursuant to the applicable terms of this Agreement, for an APU; and (iii) any and all Parts incorporated in or installed on or attached to such auxiliary power unit or any and all Parts removed therefrom so long as the Secured Party shall retain an interest therein in accordance with the applicable terms of this Agreement after such removal.

"**Associated Rights**" has the meaning ascribed thereto in the Cape Town Convention, including all rights to payment or other performance by Borrower under any Finance Document which are secured by or associated with the Collateral.

"**Banking Day**" means a day other than a Saturday or Sunday on which the Secured Party is open for business in New York, New York.

"**Bill of Sale**" means, the Bill of Sale dated _April 12_, 2012 from Agusta Westland Philadelphia Corporation (as seller) to the Grantor with respect to the Aircraft, as it may be amended, modified or supplemented from time to time.

"**Cape Town Convention**" means, collectively, the Aircraft Protocol, the Convention, the International Registry Procedures and the International Registry Regulations.

"**Closing Date**" means the date on which the Secured Party makes Loan A1 to Grantor pursuant to the Facility Agreement.

"**Collateral**" shall have the meaning set forth in Section 2.1 hereof.

"**Convention**" means the official English language text of the Convention on International Interests in Mobile Equipment, adopted on 16 November 2001 at a diplomatic conference held in Cape Town, South Africa as the same may be amended or modified from time to time.

"**Default**" means an event which, after the giving of notice or lapse of time, or both, would become an Event of Default.

"**Engine**" means (i) the Pratt & Whitney Canada PT6B-37A engine bearing manufacturer's serial number PCE-PU0165, which engine was originally installed on the Aircraft upon the Grantor's acquisition of its interest therein, whether or not from time to time thereafter installed on such Aircraft or installed on any other airframe or on any other aircraft, and (ii) any engine which shall have been substituted for an engine described in preceding clause (i), whether or not from time to time thereafter installed on the Aircraft or any other airframe or on any other aircraft, together in each case with any and all Parts, incorporated in such Engine and any and all Parts removed from such Engine so long as the Grantor has an interest in such Parts.

"**Equipment**" means any or all of the Airframe, Engines, APU and Parts.

"**Event of Default**" shall have the meaning set forth in clause 19 (*Events of Default*) of the Facility Agreement.

"**Event of Loss**" means, with respect to the Aircraft, any Engine or any APU, any of the following events with respect to the Aircraft or such Engine:

    (a)    the Aircraft or such Engine or such APU shall be lost, stolen, destroyed, rendered permanently unfit for its intended use, or irreparably damaged, from any cause whatsoever;

    (b)    the Aircraft or such Engine or such APU shall be returned to the manufacturer or seller or either of their agents or nominees pursuant to any warranty settlement or patent indemnity settlement;

\* Each of which engines has 550 or more rated takeoff horsepower or the equivalent thereof.

(c)    the Aircraft or such Engine or such APU shall be damaged to the extent that an insurance settlement is made on the basis of a total loss or a constructive or compromised total loss;

(d)    the Aircraft or such Engine or such APU shall be prohibited from use for air transportation by any agency of the Government for a period of six months or more; or

(e)    the Aircraft or such Engine or such APU shall be taken or requisitioned by condemnation or otherwise by any governmental Person, including a foreign government or the Government resulting in loss of possession by the Grantor for a period of six months or more.

"**FAA**" means the Federal Aviation Administration or any governmental Person, agency or other authority succeeding to the functions of the Federal Aviation Administration.

"**FARs**" shall mean the Federal Aviation Regulations and any Special Federal Aviation Regulations (Title 14 C.F.R. Part 1 et seq.), together with all successor regulations thereto.

"**Government**" means the federal government of the United States of America or any instrumentality or agency thereof.

"**incorporated in**" means incorporated, installed in or attached to or otherwise made a part of.

"**Indemnified Parties**" means the Secured Party and its successors, assigns, transferees, directors, officers, employees, shareholders, servants and agents.

"**International Interest**" means an International Interest under the Cape Town Convention.

"**International Registry**" means the International Registry of Mobile Assets located in Dublin, Ireland and established pursuant to the Cape Town Convention, along with any successor registry thereto.

"**International Registry Procedures**" means the official English language text of the procedures for the International Registry issued by the supervisory authority thereof pursuant to the Convention and the Aircraft Protocol, as the same may be amended or modified from time to time.

"**International Registry Regulations**" means the official English language text of the regulations for the International Registry issued by the supervisory authority thereof pursuant to the Convention and the Aircraft Protocol, as the same may be amended or modified from time to time.

"**Obligations**" shall have the meaning set forth in Section 2.1 hereof.

"**Lien**" shall mean any Security Interest.

4

4

"**Loss Value**" means 100% of the amount necessary to pay in full, as of the date of payment thereof, the Obligations.

"**Parts**" means all appliances, parts, components, rotors, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature (other than complete Engines or engines) whether now owned or hereafter acquired which may from time to time be incorporated in the Airframe, any Engine or any APU (and "Part" means any of the foregoing) or, after removal therefrom, so long as such Parts remain subject to the Lien of this Agreement in accordance with Section 3.5 or 3.6 hereof.

"**Permitted Lien**" means any Lien referred to in clauses (a) and (b) of Section 3.1.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Purchase Agreement**" means Export Contract A1, as it may be amended, modified or supplemented from time to time.

"**Records**" means any and all logs, manuals, certificates and data and inspection, modification, maintenance, engineering, technical, and overhaul records (whether in written or electronic form) with respect to the Aircraft, including, without limitation, all records (i) required to be maintained by the FAA or any other governmental agency or authority having jurisdiction with respect to the Aircraft or by any manufacturer or supplier of the Aircraft (or any part thereof) with respect to the enforcement of warranties or otherwise, (ii) evidencing the Grantor's compliance with the provisions of Section 3.4, and (iii) with respect to any maintenance service program for the Airframe or Engines.

"**Third Party Agreements**" means any and all leases, subleases, interchange agreements, charter agreements, pooling agreements, timeshare agreements and any other similar agreements or arrangements of any kind whatsoever relating to the Aircraft or any part thereof.

"**Transportation Code**" shall mean Subtitle VII of Title 49 of the United States Code, as amended and recodified.

"**UCC**" or "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect in any applicable jurisdiction.

## ARTICLE 2

### GRANT OF SECURITY INTEREST

**SECTION 2.1      Grant of Security Interest.** The Grantor, in consideration of the premises and other good and valuable consideration, receipt whereof is hereby acknowledged, and in order to secure the payment of the principal of and interest on Loan A1 according to its tenor and effect, and to secure the payment of all other indebtedness under the Finance Documents and the performance and observance of all covenants and conditions contained in the Finance Documents (collectively referred to as the "*Obligations*"), does hereby convey, warrant,

mortgage, assign, pledge, and grant a security interest to the Secured Party, its successors and assigns, in all and singular of the Grantor's right, title and interest in and to the properties, rights, interests and privileges described below and all proceeds thereof (all of which properties, rights, interests and privileges hereby mortgaged, assigned, pledged and granted or intended so to be, together with all proceeds thereof, are hereinafter collectively referred to as the "*Collateral*"):

(i)     all of the Grantor's rights, title and interests in the Equipment (including the Airframe, the Engines, the APU, and the Parts) and substitutions and replacements of any of the foregoing;

(ii)    all of the Grantor's rights, title and interests in the Records;

(iii)   all of the Grantor's rights, title and interests in any Third Party Agreements;

(iv)    all of the Grantor's rights, title and interests in the Purchase Agreement and the Bill of Sale, together with all rights, powers, privileges, options and other benefits of the Grantor under the Purchase Agreement and the Bill of Sale;

(v)     all of the Grantor's rights, title and interests in any and all service and warranty rights related to the Equipment, including the Engines, and claims under any thereof;

(vi)    all Associated Rights; and

(vii)   all proceeds of any or all of the foregoing, whenever acquired, including, but not limited to, the proceeds of any insurance maintained with respect to any of the foregoing and all proceeds payable or received with respect to any condemnation, expropriation, requisition or other Event of Loss, and the proceeds of any warranty.

The conveyance, warranty, mortgage, assignment, pledge and security interest created hereunder in all of the foregoing Collateral are effective and operative immediately, and shall continue in full force and effect until the Grantor shall have made such payments and shall have duly, fully and finally performed and observed all of its agreements and covenants and provisions then required hereunder and under the other Finance Documents.

**SECTION 2.2**     <u>**Filing of Financing Statements and Continuation Statements**</u>. The Grantor authorizes the Secured Party to file, if not already filed, such financing statements or other documents and such continuation statements with respect to financing statements previously filed relating to the conveyance, warranty, mortgage, assignment, pledge and security interest created under this Agreement in the Collateral and any other documents that may be required in order to comply with the Act or other Applicable Law, including any filings with the International Registry pursuant to the Cape Town Convention, or as may be specified from time to time by the Secured Party.

## ARTICLE 3

## COVENANTS

**SECTION 3.1**    **Ownership and Liens**.  The Grantor will not sell, lease, assign or transfer its interest in the Aircraft, the Airframe, any Engine or any APU or directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to its interest in the Aircraft, the Airframe or any Engine without the Secured Party's prior written consent, except for: (a) Liens in favor of the Secured Party; and (b) mechanics' or other like Liens arising in the ordinary course of business for amounts which are not material and the payment of which is either not yet due or is being contested in good faith by appropriate proceedings so long as such proceedings do not, in the Secured Party's opinion, involve any material danger of the attachment, sale, forfeiture or loss of any item of Equipment or any interest therein (including the Lien of the Secured Party).  The Grantor will promptly, and in any event within five days, take (or cause to be taken) such action as may be necessary duly to discharge any such Lien not excepted above if the same shall arise at any time.

**SECTION 3.2**    **Registration and Operation**.

(a)    The Grantor shall cause the Aircraft to be duly registered, and at all times thereafter to remain duly registered, in the name of the Grantor as owner with the FAA pursuant to the Act.  The Grantor agrees that it will not utilize any item of Equipment in violation of any law or any rule, regulation or order (including, without limitation, concerning alcoholic beverages or prohibited substances) of any governmental authority having jurisdiction (domestic or foreign) or in violation of any airworthiness certificate, license or registration relating to any item of Equipment issued by any such authority, except to the extent such violation is not material or the validity or application of any such law, rule, regulation or order is being contested in good faith and by appropriate proceedings (but only so long as such proceedings do not, in the Secured Party's opinion, involve any material danger of the sale, forfeiture or loss of such item of Equipment, or any interest, including the Secured Party's security interest, therein).  In the event that any such law, rule, regulation or order requires alteration of any item of Equipment, unless the validity thereof is being contested in good faith and by appropriate proceedings (but only so long as such proceedings do not in the Secured Party's opinion involve any material danger of the sale, forfeiture or loss of any item of Equipment, or any interest, including the Secured Party's security interest, therein), the Grantor will obtain conformance therewith at no expense to the Secured Party and will cause such item of Equipment to be maintained in proper operating condition under such laws, rules, regulations and orders.

(b)    There are no International Interests registered with the International Registry with respect to the Aircraft or this Agreement, and the Grantor will not permit any International Interests to be filed with the International Registry except for (i) the International Interest created by the sale pursuant to which the Grantor took title to the Aircraft, (ii) the Secured Party's interest in the Aircraft or (iii) as otherwise consented to in writing by the Secured Party.

(c)    The Grantor is a Transacting User Entity (as defined in the Cape Town Convention), has appointed an Administrator and has designated a Professional User Entity (as defined in the Cape Town Convention) acceptable to the Secured Party. The Grantor has paid all fees and taken all action required by the Secured Party to enable the Secured Party to register any International Registry registrations in the Aircraft.

(d)    The Grantor hereby consents to the registration of any International Interests arising in connection with this Agreement and/or any Finance Document in favor of the Secured Party. At closing for Loan A1, the Grantor shall authorize its Professional User Entity to consent to the registration (including all Final Consents thereto required by the Cape Town Convention) of any International Interests with the International Registry.

(e)    The Grantor shall not discharge or allow to be discharged any International Interest created in favor of the Secured Party without the Secured Party's prior written consent.

(f)    The Grantor shall not utilize the Aircraft so as to include any landings in countries other than countries that then have diplomatic relations with the United States of America. The Grantor shall not operate the Aircraft in any country or territory where armed conflict exists unless the Aircraft is fully insured against such risks.

(g)    The Grantor agrees that it will not utilize any item of Equipment in any area excluded from coverage by the insurance required by the terms of Article 5.

**SECTION 3.3**    **Records and Reports**. The Grantor shall cause all records, logs and other materials required by the FAA and any other governmental authority having jurisdiction to be maintained in respect of each item of Equipment. The Grantor shall promptly furnish or cause to be furnished to the Secured Party such information as may be required to enable the Secured Party to file any reports required to be filed by the Secured Party with any governmental authority because of the Secured Party's interests in any item of Equipment.

**SECTION 3.4**    **Maintenance**. The Grantor, at its own cost and expense, shall cause each item of Equipment to be maintained, serviced, repaired, overhauled, altered, modified, added to and tested in accordance with standard practices for similar equipment (including, without limitation, the maintenance program for such item of Equipment as from time to time in effect and approved by manufacturer and/or seller thereof, and to the extent required by law, by the FAA), which practices shall at all times be at or above the standard of the industry for maintenance of similar equipment; and, additionally, in the case of the Aircraft, cause the Aircraft to be maintained, serviced, repaired, overhauled and tested so as to keep the Aircraft in such condition as may be necessary to enable the airworthiness certification of the Aircraft to be maintained in good standing at all times under the Act. The Grantor agrees that the Aircraft, Airframe and Engines will not be maintained in violation of any law or any rule, regulation or order of any government or governmental authority (domestic or foreign) having jurisdiction, in violation of any warranty with respect to any item of Equipment or in violation of any airworthiness certificate, license or registration relating to the Aircraft, Airframe or any Engine issued by any such government or authority, except to the extent the validity or

application of any such directive, instruction, law, rule, regulation or order is being contested in good faith and by appropriate proceedings (but only so long as such proceedings do not, in the Secured Party's opinion, involve any material danger of the sale, forfeiture or loss of such item of Equipment or any interest, including the Secured Party's security interest, therein).

SECTION 3.5    Replacement of Parts.  The Grantor, at its own cost and expense, will promptly cause the replacement of all Parts which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever. In addition, the Grantor, at its own cost and expense, may permit the removal in the ordinary course of maintenance, service, repair, overhaul or testing of any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use; provided, however, that the Grantor, at its own cost and expense, will cause such Parts to be replaced as promptly as possible. All replacement Parts shall be free and clear of all Liens (except for Permitted Liens described in Section 3.1), shall be in as good operating condition as, and shall have a value and utility at least substantially equal to, the Parts replaced, assuming such replaced Parts were in the condition and repair required to be maintained by the terms hereof. The Grantor's rights, title and interests in all Parts at any time removed from any item of Equipment shall remain subject to the Lien of this Agreement no matter where located, until such time as such Parts shall be replaced by Parts which have been incorporated in such item of Equipment and which meet the requirements for replacement Parts specified above. Immediately upon any replacement Part becoming incorporated or installed in or attached to any item of Equipment as above provided, without further act, (i) the Grantor's rights, title and interests in such replacement Part shall become subject to the Lien of this Agreement, and such replacement Part shall be deemed part of such item of Equipment for all purposes hereof to the same extent as the Parts originally incorporated in such item of Equipment, and (ii) the Grantor's rights, title and interests in the replaced Part shall be released from the Lien of this Agreement and the replaced Part shall no longer be deemed a Part hereunder.

SECTION 3.6    Alterations, Modifications and Additions.  The Grantor, at its own cost and expense, shall cause such alterations and modifications in and additions to the Equipment to be made as may be required from time to time to meet the standards of the FAA and of any other governmental authority having jurisdiction and to maintain the certificate of airworthiness for the Aircraft; provided, however, that the validity or application of any such law, rule, regulation or order may be contested in good faith by appropriate proceedings (but only so long as such proceedings do not, in the Secured Party's opinion, involve any material danger of sale, forfeiture or loss of any item of Equipment, or any interest, including the Secured Party's security interest, therein). In addition, the Grantor, at no cost or expense to the Secured Party, may, from time to time, cause such alterations and modifications in and additions to any item of Equipment to be made as the Grantor may deem desirable; provided, that each such alteration, modification and addition is readily removable from such item of Equipment; and provided, further, that no such alteration, modification or addition shall (i) materially diminish the value, utility or condition of such item of Equipment below the value, utility or condition thereof immediately prior to such alteration, modification or addition, assuming the item of Equipment was then of the value and utility and in the condition required to be maintained by the terms of this Agreement, or (ii) cause the airworthiness certification of the Aircraft to cease to be in good standing under the Act. The Grantor's rights, title and interests in all Parts added to the

Aircraft, the Airframe or an Engine as the result of such alteration, modification or addition shall, without further act, be subject to the Lien of this Agreement. Notwithstanding the foregoing sentence of this Section 3.6, so long as no Event of Default shall have occurred and be continuing, the Grantor may remove any Part if (i) such Part is in addition to, and not in replacement of or substitution for, any Part originally incorporated in such item of Equipment at the time of delivery thereof or any Part in replacement of or substitution for any such Part, (ii) such Part is not required to be incorporated or installed in or attached or added to such item of Equipment pursuant to the terms of this Article 3, and (iii) such Part can be removed from such item of Equipment without causing any material damage thereto. Upon the removal of any Part as above provided, the Grantor's rights, title and interests in such Part shall be released from the Lien of this Agreement.

SECTION 3.7    **Loaner Engines**.  In the event any Engine is damaged and is being repaired, or is being inspected or overhauled, Grantor, at its option, may temporarily substitute another engine of the same make and model as the Engine being repaired or overhauled (any such substitute engine being hereinafter referred to as a "**Loaner Engine**") during the period of such repair or overhaul; provided no Event of Default or Default has occurred and is continuing and (i) installation of Loaner Engine is performed by a maintenance facility certified by the FAA and manufacturer with respect to an aircraft of this type, (ii) Loaner Engine is removed, and the repaired or overhauled original Engine is reinstalled on the Airframe promptly upon completion of the repair or overhaul but in no event later than the earlier of ninety (90) days after removal or the occurrence of an Event of Default, and (iii) Loaner Engine is free and clear of any Lien that might impair Secured Party's rights or interests in the Aircraft and is maintained in accordance herewith.

SECTION 3.8    **Maintenance of Other Engines**.  Each aircraft engine which does not constitute an Engine, but which is installed on the Airframe from time to time, shall be maintained, operated, serviced, repaired, overhauled, altered, modified and tested in accordance with Section 3.4 to the same extent as if it were an Engine.

SECTION 3.9    **Payment of Obligations**.  The Grantor hereby agrees that it will promptly pay or cause to be paid when due all taxes, assessments and other governmental charges imposed with respect to the Collateral (except to the extent being contested in good faith and by appropriate proceedings).

SECTION 3.10    **Change of Name or Location**.  In connection with any change of the name, identity or structure of the Grantor that might make the UCC financing statements filed in connection with the transactions contemplated hereby seriously misleading within the meaning of the UCC or any change in the location of the Grantor or the jurisdiction of organization of the Grantor, the Grantor shall give the Secured Party notice of such change at least 10 Banking Days prior to such change.

SECTION 3.11    **Inspection**.  The Grantor shall permit, at its expense, the Secured Party or any Person designated by the Secured Party to inspect (i) the Aircraft; provided, however, that as long as no Event of Default has occurred and is continuing, the Secured Party shall not exercise such inspection rights more than once a year or in such a way so as to

unreasonably interfere with the Grantor's use of the Aircraft and (ii) the logs, maintenance records and other records maintained with respect to the Aircraft.

## ARTICLE 4

## EVENTS OF LOSS

**SECTION 4.1**     **Event of Loss with Respect to the Aircraft**.  Upon the occurrence of an Event of Loss with respect to the Aircraft, the Grantor shall give the Secured Party prompt written notice thereof (and in any event within three Banking Days after such occurrence), and the Grantor shall, on or before the Banking Day which is the earliest of (i) the thirtieth (30th) day following the date of the occurrence of such Event of Loss, or (ii) the next Banking Day following the receipt of insurance proceeds with respect to such occurrence, pay to the Secured Party the Loss Value.  In the event of payment in full by the Grantor of the appropriate Loss Value and all other amounts then due and payable hereunder and under any other Finance Document, the Grantor's rights, title and interest in the Aircraft having suffered the Event of Loss shall be released from this Agreement and the Secured Party shall execute and deliver, at the Grantor's cost and expense, such instruments as may be reasonably required to evidence such release.

**SECTION 4.2**     **Event of Loss with Respect to an Engine or APU**.  Upon the occurrence of an Event of Loss with respect to any Engine or APU, the Grantor shall give the Secured Party prompt written notice thereof (and in any event within three Banking Days after such occurrence), and the Grantor shall, as soon as possible, but no later than thirty (30) days following the date of the occurrence of such Event of Loss either:

(a)     pay to the Secured Party the Loss Value; or

(b)     enter into, at the expense of the Grantor, an agreement in all respects satisfactory to the Secured Party, for the purchase of a new Engine or APU, as the case may be, of the same make, model and specifications as the Engine or APU, as the case may be, subject to the Event of Loss in order to enable the Grantor to promptly replace the Engine or APU, as the case may be, subject to such Event of Loss.  Upon delivery of any such new Engine or APU, as the case may be, pursuant to such agreement, the Grantor shall cause any such new Engine or APU, as the case may be, to be installed on the Aircraft and specifically subject such new Engine or APU, as the case may be, to the Lien hereof by delivering to Secured Party all documents and instruments to effectuate such Lien as the Secured Party may reasonably request.

In the event of payment in full by the Grantor of the appropriate Loss Value and all other amounts then due and payable hereunder and under any other Finance Document, the Grantor's rights, title and interest in the Engine or APU, as the case may be, having suffered the Event of Loss and the Aircraft shall be released from this Agreement and the Secured Party shall execute and deliver, at the Grantor's cost and expense, such instruments as may be reasonably required to evidence such release.

SECTION 4.3    **Application of Payments from Governmental Authorities or other Persons.**  Any payments (other than insurance proceeds, the application of which is provided for in Article 5 or Section 4.1 or Section 4.2), received at any time by the Secured Party or the Grantor from any governmental authority or other Person with respect to any Event of Loss, or from a governmental authority with respect to an event which does not constitute an Event of Loss, shall be applied as follows:

(a)    **Reduction of Loss Value.**  Such payments shall be applied in reduction of the Grantor's obligation to pay the Loss Value, if not already paid by the Grantor, or, if already paid by the Grantor, shall be applied to reimburse the Grantor for its payment of such amounts.  The balance, if any, of such payment remaining thereafter, and after payment of all amounts then due and payable under the Finance Documents, shall be paid to the Grantor.

(b)    **Use of Aircraft Not Constituting an Event of Loss.**  If such payments are received with respect to a requisition for use by the government which does not constitute an Event of Loss, such payments may be retained by the Grantor.

(c)    **Payments During Default.**  Notwithstanding the foregoing provisions of this Section 4.3, any payments (other than insurance proceeds, the application of which is provided for in Article 5) received at any time by the Secured Party from any governmental authority or other Person with respect to any Event of Loss, which are payable to the Grantor, shall not be paid to the Grantor if at the time of such payment an Event of Default or Default shall have occurred and be continuing, in which event all such amounts shall be paid to and held by the Secured Party as security for the Obligations or, at the Secured Party's option, applied by the Secured Party toward the payment of such Obligations at the time due in such order of application as the Secured Party may from time to time elect.  At such time as there shall not be any Event of Default or Default, all such amounts at the time held by the Secured Party in excess of the amount, if any, which the Secured Party shall have elected to apply as above provided shall be paid to the Grantor.

In furtherance of the foregoing, the Grantor hereby irrevocably assigns, transfers and sets over to the Secured Party all rights of the Grantor to any award or payment received by or payable to the Grantor on account of an Event of Loss.

## ARTICLE 5

### INSURANCE

SECTION 5.1    **Insurance.**  The Grantor shall, at all times, at its own cost and expense, comply with its covenants under clause 18.14 (Insurance) of the Facility Agreement.

SECTION 5.2    **Certificates of Insurance.**  Prior to making Loan A1 and, (if required by the Secured Party) at least three full Banking Days prior thereto, the Secured Party shall have received evidence as to the insurance coverage required under this Agreement, including, but not limited to, a certificate of insurance, copies of endorsements (including a

Secured Party endorsement), and, if requested by the Secured Party, copies of applicable policies and written confirmation from the insurance underwriter or broker that the insurance coverage provided is in compliance with the requirements of Section 5.1 of this Agreement. At least ten (10) days prior to the policy expiration date for any insurance coverage required by Section 5.1, the Grantor shall furnish to the Secured Party evidence (in form and substance satisfactory to the Secured Party) of the renewal or replacement of such coverage, complying with the terms hereof, for a twelve (12) month or greater period commencing from and after such expiration date until the Obligations secured hereby are paid in full.

SECTION 5.3    **Proceeds of Insurance**.  Any proceeds of insurance received by the Secured Party as a result of an Event of Loss with respect to the Aircraft or any Engine, shall be applied to reduce the Grantor's obligation to pay the Loss Value, if not already paid by the Grantor, or, if already paid by the Grantor, shall be paid over to the Grantor; provided, however, that if a Default or an Event of Default shall have occurred and be continuing, such proceeds shall be held by the Secured Party as security for the Obligations or, at the Secured Party's option, applied to the payment of the Obligations in such order as the Secured Party may from time to time elect. In the event of any damage to, or loss, theft or destruction of, the Aircraft or any Engine by any cause whatsoever not involving an Event of Loss, all insurance proceeds in respect thereof shall be paid to the Grantor in trust for the repair and restoration of the Aircraft to good repair, condition and working order.

## ARTICLE 6

## REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT

SECTION 6.1    **Action upon Event of Default**.  Upon the occurrence of an Event of Default described in clause 19.5 (*Insolvency*), clause 19.6 (*Insolvency proceedings*) or clause 19.7 (*Creditors' process*) of the Facility Agreement, unless the Secured Party should otherwise agree, the commitment of the Secured Party to make Loan A1 shall automatically and without further act terminate and the unpaid principal of (and indemnification for funding losses, if any) and accrued interest on Loan A1 and all other amounts due and payable under this Agreement and the other Finance Documents shall automatically and without further act become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, anything contained herein or in any other Finance Document to the contrary notwithstanding, and the Secured Party may immediately exercise and pursue any remedy described herein or otherwise available to it in any Finance Document, at law, in equity or by statute (subject always to compliance with any mandatory requirements of Applicable Law). If any other Event of Default shall have occurred and be continuing, the Secured Party may, at its option, declare the commitment of the Secured Party to make Loan A1 to be terminated and the unpaid principal of (and indemnification for funding losses, if any) and accrued interest on Loan A1 and all other amounts due and payable under this Agreement and the other Finance Documents to be forthwith due and payable, whereupon such commitment shall immediately terminate and Loan A1 and such other amounts shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein or in any other Finance Document to the contrary notwithstanding; and the Secured Party may immediately exercise and pursue any remedy described herein or otherwise available to it in any Finance Document, at law, in equity or by

statute (subject always to compliance with any mandatory requirements of Applicable Law). Upon such declaration, the Secured Party may exercise any or all of the rights and powers and pursue any or all of the remedies permitted by this Article 6.

SECTION 6.2    **Remedies**.  The Grantor agrees, to the full extent that it lawfully may, that if one or more Events of Default shall have occurred and be continuing, then in every such case the Secured Party may exercise any or all of the rights and powers and pursue any and all of the remedies available to it hereunder or in any other Finance Document or available to a secured party under the Uniform Commercial Code or any other provision of law or equity, including, without limitation, the Cape Town Convention; the Secured Party may exclude the Grantor from the Collateral; and the Secured Party may sell, assign, transfer and deliver, to the extent permitted by law, the Collateral or any interest therein, whether or not the Collateral is in the constructive possession of the Secured Party or the Person conducting the sale, at any private sale or public auction with or without demand, advertisement or notice (except as may be required by law) of the date, time and place of sale and any adjournment thereof, for cash or credit or other property, for immediate or future delivery and for such price or prices and on such terms and to such Persons as the Secured Party in its discretion may determine or as may be required by law; and the Secured Party may otherwise dispose of, hold or use the Collateral, or any part thereof, as the Secured Party in its sole discretion may determine, in each case free and clear of any rights of the Grantor and without any duty to account to the Grantor with respect to any such action or inaction or for any proceeds with respect thereto.  It is agreed that 10 days' notice to the Grantor of the date, time and place (and terms, in the case of a private sale) of any proposed sale by the Secured Party of the Collateral or any part thereof or interest therein is reasonable.

The Secured Party may proceed to enforce its rights by directing payment to it of all monies payable under any agreement relating to the Collateral, by proceedings in any court of competent jurisdiction for an appointment of a receiver or for the sale of all or any part of the Collateral possession to which the Secured Party shall at the time be entitled hereunder or for foreclosure of such Collateral, or by any other action, suit, remedy or proceeding authorized or permitted by this Agreement or at law or by equity, and may file such proofs of claim or other papers or documents as necessary or advisable in order to have the claims of the Secured Party asserted or upheld in any bankruptcy, receivership or other judicial case or proceeding.

In addition to the foregoing remedies, the Grantor shall be liable for any and all unpaid amounts due hereunder and under the other Finance Documents before, during and after the exercise of any of the foregoing remedies and for all reasonable legal fees and other reasonable costs and expenses of the Secured Party, including, without limitation, attorneys' fees and legal expenses, incurred by reason of the occurrence of any Event of Default or the exercise of any remedies with respect thereto.

SECTION 6.3    **Remedies Cumulative**.  Each and every right, power and remedy herein specifically given to the Secured Party or otherwise in this Agreement or the other Finance Documents shall be cumulative and shall be in addition to every other right, power and remedy herein or therein specifically given or now or hereafter existing at law (including the Cape Town Convention), in equity or by statute, and each and every right, power and remedy whether specifically herein or therein given or otherwise existing may be exercised from time to

EAST\48268565.2 14

14

time and as often and in such order as may be deemed expedient by the Secured Party, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy. No delay or omission by the Secured Party in the exercise of any right, power or remedy or in the pursuit of any remedy shall impair any such right, power or remedy or be construed to be a waiver of any default on the part of the Grantor to be an acquiescence therein.

SECTION 6.4    Grantor's Waiver of Rights.    To the extent permitted by Applicable Law, the Grantor hereby waives any rights, now or hereafter conferred by statute or otherwise, which might limit or modify any of the rights or remedies of the Secured Party under or in connection with this Article 6.

SECTION 6.5    Power of Attorney.    The Grantor hereby appoints the Secured Party or its designated agent as such Grantor's attorney-in-fact, irrevocably, with full power of substitution, to collect all payments with respect to the Collateral due and to become due under or arising out of this Agreement or any other Finance Document, to receive all moneys (including, but not limited to, proceeds of insurance) which may become due under any policy insuring the Collateral and all awards payable in connection with the condemnation, requisition or seizure of the Collateral, or any part thereof, to execute proofs of claim, to endorse drafts, checks and other instruments for the payment of money payable to the Grantor in payment of such insurance moneys and to do all other acts, things, take any actions (including the filing of financing statements, FAA filings, Cape Town Convention registrations or other documents) or institute any proceedings which the Secured Party may deem to be necessary or appropriate at any time to protect and preserve the interest of the Secured Party in the Collateral, or in this Agreement or the other Finance Documents.

SECTION 6.6    Distribution of Amounts Received after an Event of Default. All payments received and amounts realized by the Secured Party with respect to the Collateral after an Event of Default shall have occurred and be continuing (whether realized from the exercise of any remedies pursuant to this Article 6 or otherwise), as well as payments or amounts then held by the Secured Party as part of the Collateral, shall be distributed by the Secured Party in the following order of priority:

First, so much of such payments and amounts as shall be required to pay the expenses paid by the Secured Party pursuant to this Article 6 (to the extent not previously reimbursed) shall be paid to the Secured Party;

Second, so much of such payments or amounts as shall be required to pay the amounts payable to any Indemnified Party (to the extent not previously reimbursed) shall be paid to such Indemnified Party;

Third, so much of such payments or amounts remaining as shall be required to pay in full the aggregate unpaid principal amount of Loan A1 (on a pro rata basis), the accrued but unpaid interest thereon to the date of distribution, indemnification for funding losses, if any, and all other Obligations, shall be paid to the Secured Party; such payments or amounts to be applied to the amounts so due, owing or unpaid in such order of application as the Secured Party may from time to time elect; and

Fourth, the balance, if any, of such payments or amounts remaining thereafter shall be paid to the Grantor.

SECTION 6.7    Suits for Enforcement.  In case of any default in payment of Loan A1 beyond any applicable grace period, then, regardless of whether or not Loan A1 has then been accelerated, the Secured Party may proceed to enforce the payment of Loan A1.  The Grantor agrees that, in the case of any default in the payment of Loan A1, it will pay the Secured Party such further amount as shall be sufficient to pay the costs and expenses of collection, including reasonable counsel fees and expenses.

## ARTICLE 7

## AMENDMENTS

SECTION 7.1    Amendments.  Neither this Agreement, nor any of the terms hereof, may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing which is signed by the party against whom the enforcement of the termination, amendment, supplement, waiver or modification is sought.

## ARTICLE 8

## SECURITY INTEREST ABSOLUTE

SECTION 8.1    Security Interest Absolute.  All rights of the Secured Party and the security interests granted to the Secured Party hereunder, and all obligations of the Grantor hereunder, shall be absolute and unconditional, irrespective of:

(a)    any lack of validity or enforceability of any Finance Document;

(b)    the failure of the Secured Party to

(i)    assert any claim or demand or to enforce any right or remedy against the Grantor or any other Person under the provisions of the Facility Agreement any other Finance Document or otherwise; or

(ii)    to exercise any right or remedy against any guarantor of, or collateral securing, any of the Obligations;

(c)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other extension, compromise or renewal of any of the Obligations;

(d)    any reduction, limitation, impairment or termination of any of the Obligations for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and the Grantor hereby waives any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any of the Obligations;

(e)    any amendment to, rescission, waiver, or other modification of, or any consent to departure from, any of the terms of the Facility Agreement or any other Finance Document,

(f)    any addition, exchange, release, surrender or nonperfection of any collateral (including the Collateral), or any amendment to or waiver or release of or addition to or consent to departure from any guaranty, for any of the Obligations; or

(g)    any other circumstances which might otherwise constitute a defense available to, or a legal or equitable discharge of, the Grantor, any surety or any guarantor.

## ARTICLE 9

### MISCELLANEOUS

**SECTION 9.1    GOVERNING LAW. THIS AGREEMENT IS BEING DELIVERED IN THE STATE OF NEW YORK. THIS AGREEMENT, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.**

**SECTION 9.2    Notices.**    All notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as the Secured Party and the Grantor may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

**SECTION 9.3    Limitation as to Enforcement of Rights, Remedies and Claims.** Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Grantor and the Secured Party any legal or equitable right, remedy or claim under or in respect of this Agreement or any other Finance Document.

**SECTION 9.4    Severability of Invalid Provisions.**    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such provision, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**SECTION 9.5    Benefit of Parties, Successors and Assigns; Entire Agreement.** All representations, warranties, covenants and agreements contained herein or delivered in connection herewith shall be binding upon, and inure to the benefit of, the Grantor and the Secured Party and their respective legal representatives, successors and assigns; provided,

however, that the Grantor may not assign its obligations hereunder. This Agreement, together with the other Finance Documents, constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior understandings and agreements of such parties.

SECTION 9.6    Counterpart Execution.  This Agreement and any amendment to this Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when so executed and delivered, shall be an original, but all such counterparts shall together constitute but one and the same instrument. Fully executed sets of counterparts shall be delivered to, and retained by, the Grantor and the Secured Party.

SECTION 9.7    Further Assurances.  At any time and from time to time, upon the request of the Secured Party, the Grantor shall promptly and duly execute and deliver any and all such further instruments and documents as may be specified in such request, and as are necessary or desirable to perfect, preserve or protect the security interests and assignments created or intended to be created hereby, or to obtain for the Secured Party the full benefit of the specific rights and powers herein granted, including, without limitation, the execution and delivery of Uniform Commercial Code financing statements and continuation statements with respect thereto, Cape Town Convention registrations or similar instruments relating to the perfection of the mortgage, security interests or assignments created or intended to be created hereby.

SECTION 9.8    Performance by Secured Party.  In its discretion, the Secured Party may (but shall not be obligated to), at any time and from time to time (regardless of whether or not an Event of Default has occurred), for the account of the Grantor, pay any amount or do any act required of the Grantor hereunder and which the Grantor fails to pay or do at the time required hereunder, and any such payment shall be repayable by the Grantor on demand to the Secured Party, shall bear interest at the interest rate required under the Facility Agreement and shall be secured by the Collateral.

SECTION 9.9    Indemnity.  The Grantor agrees to indemnify the Secured Party from and against any and all claims, losses and liabilities arising out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting from the Secured Party's gross negligence or willful misconduct.

SECTION 9.10    Consent to Jurisdiction.  To induce the Secured Party to accept this Agreement, the Grantor irrevocably agrees that, subject to the Secured Party's sole and absolute election, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT WILL BE LITIGATED IN COURTS HAVING SITUS IN THE COUNTY OF NEW YORK IN NEW YORK CITY, NEW YORK.  THE GRANTOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN THE COUNTY OF NEW YORK IN NEW YORK CITY, NEW YORK. NOTWITHSTANDING ANYTHING IN THE FOREGOING TO THE CONTRARY, THE GRANTOR AND THE LENDER MAY BRING A JUDICIAL PROCEEDING AGAINST THE REGISTRAR OF THE INTERNATIONAL REGISTRY IN THE REPUBLIC OF IRELAND, SOLELY TO THE EXTENT SUCH PROCEEDING SEEKS RELIEF FROM THE INTERNATIONAL REGISTRY.

SECTION 9.11    <u>Waiver of Jury Trial</u>. THE GRANTOR AND THE LENDER EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (a) UNDER THIS AGREEMENT OR ANY FINANCE DOCUMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR ANY FINANCE DOCUMENT OR (b) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE GRANTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

SECTION 9.12    <u>Service of Process</u>. The Grantor hereby irrevocably appoints CT Corporation for the service of process in any action or proceeding referred to in Section 9.10 by the mailing thereof by certified mail, return receipt requested, addressed to 111 Eighth Avenue, New York, New York 10011, and hereby waives personal service of process upon the Grantor.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have each executed this Agreement, as of the date set forth above.

GRANTOR:

HELI USA AIRWAYS INC.

By: _____

Name: _Nigel Turner_____

Title: _President + CEO._____

Address: _235 E. Tropicana Ave #115_

_Las Vegas, NV  89169_____

Telecopier: _(702)  736 - 4488_

LENDER:

INTESA SANPAOLO S.P.A.,
    NEW YORK BRANCH

By:_____

Name:_____

Title:_____

Address: _____

_____

_____

Attention:_____

Telecopier: (___) ____-_____

with a copy to:

[_____]
[_____]

26

IN WITNESS WHEREOF, the parties have each executed this Agreement, as of the date set forth above.

GRANTOR:

HELI USA AIRWAYS INC.

By:_____
Name:_____
Title:_____

Address: _____
_____

       Telecopier: _____

LENDER:

INTESA SANPAOLO S.P.A.,
   NEW YORK BRANCH

By:_____
Name:_____
Title: *P. Pastorino, VP*     *A. DiMaggio, VP*

Address: One William Street
     New York, NY 10004
_____

     Attention: Mr. Roberto Carvalho, Analyst
     Telecopier: (___) ____-_____

with a copy to:

    [_____]
    [_____]

20

Attention: [_____]
Telecopier: [_____]

**SACE AGENT:**

**INTESA SANPAOLO S.P.A.,**
**LONDON BRANCH**

By:_____
Name:_____
Title:_____

Address:_____
_____
_____
Attention:_____
Telecopier: (___) ____-_____

with a copy to:

[_____]
[_____]
Attention: [_____]
Telecopier: [_____]

**ARRANGER:**

**INTESA SANPAOLO S.P.A.**

By: _Clfeere_      _M. S_
Name: _M. SIMEONI_      _K. COBAS_
Title: _DIRECTOR_      _HEAD OF STRUCTURED
EXPORT FINANCE_
Address: _Structured Export Finance_
_Piazza della Scala, 6_
_20121 Milano_
Attention: _Mrs. Maria Simeoni_
Telecopier: (___) ____-_____

with a copy to:

Attention: [_____]
Telecopier: [_____]

SACE AGENT:

INTESA SANPAOLO S.P.A.,
    LONDON BRANCH

By:_____
Name:_____
Title:_____
                Andrea Contardo
                Assistant General Manager

Address: Loan Administration and Agency Dept.
         90 Queen Street
         London EC4N 1SA, United Kingdom
Attention: Mr. Giovanni Monaco
Telecopier: (___) ___-_____

Alessia Picci
Manager, Loans
and Agency Dept

with a copy to:

[_____]
[_____]
Attention: [_____]
Telecopier: [_____]

ARRANGER:

INTESA SANPAOLO S.P.A.,
    MILAN BRANCH

By:_____
Name:_____
Title:_____

Address:_____
        _____
        _____
Attention:_____
Telecopier: (___) ___-_____

with a copy to:

[_____]
[_____]
Attention: [_____]
Telecopier: [_____]

# EXHIBIT "2"

# EXHIBIT "2"

# MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT

Dated as of April _5_, 2012

between

## HELI USA AIRWAYS, INC.

as the Grantor

and

## INTESA SANPAOLO S.P.A.

as the Secured Party

## MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT

**THIS MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT**, dated as of April ⟨_ , 2012 is between HELI USA AIRWAYS ,INC., a Nevada corporation (hereinafter referred to as the "**Grantor**"), and INTESA SANPAOLO S.P.A., a company incorporated in Italy, operating through its New York Branch in its capacity as Lender, through its London Branch in its capacity as SACE Agent, and through its Milan Branch in its capacity as Arranger (the "**Secured Party**").

## R E C I T A L S

A.    Pursuant to a SACE Facility Agreement dated as of March 28, 2012 (together with all amendments, modifications and supplements thereto, if any, the "**Facility Agreement**") between the Grantor and the Secured Party, the Secured Party has agreed to make a term Loan to the Grantor ("**Loan A2**").

B.    As a condition precedent to the making of Loan A2 under the Facility Agreement, the Grantor is required to execute and deliver this Agreement.

C.    Grantor is duly authorized to execute, deliver and perform this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce the Secured Party to make Loan A2 pursuant to the Facility Agreement, the Grantor agrees, for the benefit of the Secured Party, as follows:

## ARTICLE 1

## DEFINITIONS

**SECTION 1.1**    **Definitions**.    In this Agreement, unless the context otherwise requires, the terms defined herein and in any agreement executed in connection herewith include, where appropriate, the plural as well as the singular and the singular as well as the plural. Except as otherwise indicated, all agreements defined herein refer to the same as from time to time amended or supplemented or the terms thereof waived or modified in accordance herewith and therewith. Unless otherwise defined herein, capitalized terms used herein shall have the meanings given thereto in the Facility Agreement. The following terms shall have the respective meanings set forth below:

"**Act**" means the Federal Aviation Act of 1958, as amended from time to time and recodified in Subtitle VII of Title 49 of the United States Code.

"**Administrator**" means the Person designated to act on behalf of the Grantor in accordance with the Cape Town Convention.

"**Agreement**", "**this Agreement**", "**hereby**", "**herein**", "**hereof**", "**hereunder**" or other like words means this Mortgage, Security Agreement and Assignment, as it may be amended, modified or supplemented from time to time.

"**Aircraft**" means the Airframe, together with the Engines initially installed on such Airframe when delivered to the Grantor (or any replacement Engine substituted for any of such Engines hereunder), whether or not any such initial or replacement Engines may from time to time thereafter be installed on such Airframe or may be installed on any other airframe or on any other aircraft, and all Parts, including avionics, any APU and related equipment, manuals and logs.

"**Aircraft Protocol**" means the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on 16 November 2001 at a diplomatic conference held in Cape Town, South Africa as the same may be amended or modified from time to time.

"**Airframe**" means (i) the Agusta Aerospace Corporation model AW119 MKII aircraft (excluding the Engines or engines from time to time installed thereon) bearing United States Federal Aviation Administration Registration Number N192NT and manufacturer's serial number 14760 and (ii) any and all Parts so long as the same shall be incorporated in such aircraft and any and all Parts removed from such aircraft so long as such Parts shall remain subject to this Agreement and the Lien hereof in accordance with the terms of Section 3.5. The Airframe is type certified by the FAA to transport at least five people (including crew) or goods in excess of 450 kilograms.

"**Applicable Law**" shall mean all applicable laws, statutes, treaties, conventions, judgments, decrees, injunctions, writs and orders of any court, governmental agency or authority and rules and regulations, orders, directives, licenses and permits of any governmental body, instrumentality, agency or authority as amended and revised, and any judicial or administrative interpretation of any of the same, including the airworthiness certificate issued with respect to the Aircraft, the Cape Town Convention, the UCC, the Transportation Code, all FARs, airworthiness directives, taxes and other impositions, and/or any of the same relating to the Collateral generally or noise, the environment, national security, public safety, insurance, exports or imports or contraband.

"**APU**" means (i) any auxiliary power unit installed on the Airframe as of the Closing Date, whether or not hereafter installed on the Airframe or any other airframe from time to time; (ii) any auxiliary power unit that may from time to time be substituted, pursuant to the applicable terms of this Agreement, for an APU; and (iii) any and all Parts incorporated in or installed on or attached to such auxiliary power unit or any and all Parts removed therefrom so long as the Secured Party shall retain an interest therein in accordance with the applicable terms of this Agreement after such removal.

"**Associated Rights**" has the meaning ascribed thereto in the Cape Town Convention, including all rights to payment or other performance by Borrower under any Finance Document which are secured by or associated with the Collateral.

"**Banking Day**" means a day other than a Saturday or Sunday on which the Secured Party is open for business in New York, New York.

"**Bill of Sale**" means, the Bill of Sale dated _April 5_, 2012 from Agusta Westland Philadelphia Corporation (as seller) to the Grantor with respect to the Aircraft, as it may be amended, modified or supplemented from time to time.

"**Cape Town Convention**" means, collectively, the Aircraft Protocol, the Convention, the International Registry Procedures and the International Registry Regulations.

"**Closing Date**" means the date on which the Secured Party makes Loan A2 to Grantor pursuant to the Facility Agreement.

"**Collateral**" shall have the meaning set forth in Section 2.1 hereof.

"**Convention**" means the official English language text of the Convention on International Interests in Mobile Equipment, adopted on 16 November 2001 at a diplomatic conference held in Cape Town, South Africa as the same may be amended or modified from time to time.

"**Default**" means an event which, after the giving of notice or lapse of time, or both, would become an Event of Default.

"**Engine**" means (i) the Pratt & Whitney Canada PT6B-37A engine bearing manufacturer's serial number PCE-PU0170,* which engine was originally installed on the Aircraft upon the Grantor's acquisition of its interest therein, whether or not from time to time thereafter installed on such Aircraft or installed on any other airframe or on any other aircraft, and (ii) any engine which shall have been substituted for an engine described in preceding clause (i), whether or not from time to time thereafter installed on the Aircraft or any other airframe or on any other aircraft, together in each case with any and all Parts, incorporated in such Engine and any and all Parts removed from such Engine so long as the Grantor has an interest in such Parts.

"**Equipment**" means any or all of the Airframe, Engines, APU and Parts.

"**Event of Default**" shall have the meaning set forth in clause 19 (*Events of Default*) of the Facility Agreement.

"**Event of Loss**" means, with respect to the Aircraft, any Engine or any APU, any of the following events with respect to the Aircraft or such Engine:

(a)    the Aircraft or such Engine or such APU shall be lost, stolen, destroyed, rendered permanently unfit for its intended use, or irreparably damaged, from any cause whatsoever;

(b)    the Aircraft or such Engine or such APU shall be returned to the manufacturer or seller or either of their agents or nominees pursuant to any warranty settlement or patent indemnity settlement;

*Each of which engines has **550 or more rated takeoff horsepower or the equivalent thereof.**

(c)      the Aircraft or such Engine or such APU shall be damaged to the extent that an insurance settlement is made on the basis of a total loss or a constructive or compromised total loss;

(d)      the Aircraft or such Engine or such APU shall be prohibited from use for air transportation by any agency of the Government for a period of six months or more; or

(e)      the Aircraft or such Engine or such APU shall be taken or requisitioned by condemnation or otherwise by any governmental Person, including a foreign government or the Government resulting in loss of possession by the Grantor for a period of six months or more.

"**FAA**" means the Federal Aviation Administration or any governmental Person, agency or other authority succeeding to the functions of the Federal Aviation Administration.

"**FARs**" shall mean the Federal Aviation Regulations and any Special Federal Aviation Regulations (Title 14 C.F.R. Part 1 et seq.), together with all successor regulations thereto.

"**Government**" means the federal government of the United States of America or any instrumentality or agency thereof.

"**incorporated in**" means incorporated, installed in or attached to or otherwise made a part of.

"**Indemnified Parties**" means the Secured Party and its successors, assigns, transferees, directors, officers, employees, shareholders, servants and agents.

"**International Interest**" means an International Interest under the Cape Town Convention.

"**International Registry**" means the International Registry of Mobile Assets located in Dublin, Ireland and established pursuant to the Cape Town Convention, along with any successor registry thereto.

"**International Registry Procedures**" means the official English language text of the procedures for the International Registry issued by the supervisory authority thereof pursuant to the Convention and the Aircraft Protocol, as the same may be amended or modified from time to time.

"**International Registry Regulations**" means the official English language text of the regulations for the International Registry issued by the supervisory authority thereof pursuant to the Convention and the Aircraft Protocol, as the same may be amended or modified from time to time.

"**Obligations**" shall have the meaning set forth in Section 2.1 hereof.

"**Lien**" shall mean any Security Interest.

"**Loss Value**" means 100% of the amount necessary to pay in full, as of the date of payment thereof, the Obligations.

"**Parts**" means all appliances, parts, components, rotors, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature (other than complete Engines or engines) whether now owned or hereafter acquired which may from time to time be incorporated in the Airframe, any Engine or any APU (and "Part" means any of the foregoing) or, after removal therefrom, so long as such Parts remain subject to the Lien of this Agreement in accordance with Section 3.5 or 3.6 hereof.

"**Permitted Lien**" means any Lien referred to in clauses (a) and (b) of Section 3.1.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Purchase Agreement**" means Export Contract A2, as it may be amended, modified or supplemented from time to time.

"**Records**" means any and all logs, manuals, certificates and data and inspection, modification, maintenance, engineering, technical, and overhaul records (whether in written or electronic form) with respect to the Aircraft, including, without limitation, all records (i) required to be maintained by the FAA or any other governmental agency or authority having jurisdiction with respect to the Aircraft or by any manufacturer or supplier of the Aircraft (or any part thereof) with respect to the enforcement of warranties or otherwise, (ii) evidencing the Grantor's compliance with the provisions of Section 3.4, and (iii) with respect to any maintenance service program for the Airframe or Engines.

"**Third Party Agreements**" means any and all leases, subleases, interchange agreements, charter agreements, pooling agreements, timeshare agreements and any other similar agreements or arrangements of any kind whatsoever relating to the Aircraft or any part thereof.

"**Transportation Code**" shall mean Subtitle VII of Title 49 of the United States Code, as amended and recodified.

"**UCC**" or "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect in any applicable jurisdiction.

## ARTICLE 2

## GRANT OF SECURITY INTEREST

**SECTION 2.1**    **Grant of Security Interest**.  The Grantor, in consideration of the premises and other good and valuable consideration, receipt whereof is hereby acknowledged, and in order to secure the payment of the principal of and interest on Loan A2 according to its tenor and effect, and to secure the payment of all other indebtedness under the Finance Documents and the performance and observance of all covenants and conditions contained in the Finance Documents (collectively referred to as the "*Obligations*"), does hereby convey, warrant,

mortgage, assign, pledge, and grant a security interest to the Secured Party, its successors and assigns, in all and singular of the Grantor's right, title and interest in and to the properties, rights, interests and privileges described below and all proceeds thereof (all of which properties, rights, interests and privileges hereby mortgaged, assigned, pledged and granted or intended so to be, together with all proceeds thereof, are hereinafter collectively referred to as the "*Collateral*"):

        (i)      all of the Grantor's rights, title and interests in the Equipment (including the Airframe, the Engines, the APU, and the Parts) and substitutions and replacements of any of the foregoing;

        (ii)     all of the Grantor's rights, title and interests in the Records;

        (iii)    all of the Grantor's rights, title and interests in any Third Party Agreements;

        (iv)    all of the Grantor's rights, title and interests in the Purchase Agreement and the Bill of Sale, together with all rights, powers, privileges, options and other benefits of the Grantor under the Purchase Agreement and the Bill of Sale;

        (v)     all of the Grantor's rights, title and interests in any and all service and warranty rights related to the Equipment, including the Engines, and claims under any thereof;

        (vi)    all Associated Rights; and

        (vii)   all proceeds of any or all of the foregoing, whenever acquired, including, but not limited to, the proceeds of any insurance maintained with respect to any of the foregoing and all proceeds payable or received with respect to any condemnation, expropriation, requisition or other Event of Loss, and the proceeds of any warranty.

The conveyance, warranty, mortgage, assignment, pledge and security interest created hereunder in all of the foregoing Collateral are effective and operative immediately, and shall continue in full force and effect until the Grantor shall have made such payments and shall have duly, fully and finally performed and observed all of its agreements and covenants and provisions then required hereunder and under the other Finance Documents.

    **SECTION 2.2**    **Filing of Financing Statements and Continuation Statements**. The Grantor authorizes the Secured Party to file, if not already filed, such financing statements or other documents and such continuation statements with respect to financing statements previously filed relating to the conveyance, warranty, mortgage, assignment, pledge and security interest created under this Agreement in the Collateral and any other documents that may be required in order to comply with the Act or other Applicable Law, including any filings with the International Registry pursuant to the Cape Town Convention, or as may be specified from time to time by the Secured Party.

## ARTICLE 3

## COVENANTS

**SECTION 3.1** **Ownership and Liens.** The Grantor will not sell, lease, assign or transfer its interest in the Aircraft, the Airframe, any Engine or any APU or directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to its interest in the Aircraft, the Airframe or any Engine without the Secured Party's prior written consent, except for: (a) Liens in favor of the Secured Party; and (b) mechanics' or other like Liens arising in the ordinary course of business for amounts which are not material and the payment of which is either not yet due or is being contested in good faith by appropriate proceedings so long as such proceedings do not, in the Secured Party's opinion, involve any material danger of the attachment, sale, forfeiture or loss of any item of Equipment or any interest therein (including the Lien of the Secured Party). The Grantor will promptly, and in any event within five days, take (or cause to be taken) such action as may be necessary duly to discharge any such Lien not excepted above if the same shall arise at any time.

**SECTION 3.2** **Registration and Operation.**

(a)    The Grantor shall cause the Aircraft to be duly registered, and at all times thereafter to remain duly registered, in the name of the Grantor as owner with the FAA pursuant to the Act. The Grantor agrees that it will not utilize any item of Equipment in violation of any law or any rule, regulation or order (including, without limitation, concerning alcoholic beverages or prohibited substances) of any governmental authority having jurisdiction (domestic or foreign) or in violation of any airworthiness certificate, license or registration relating to any item of Equipment issued by any such authority, except to the extent such violation is not material or the validity or application of any such law, rule, regulation or order is being contested in good faith and by appropriate proceedings (but only so long as such proceedings do not, in the Secured Party's opinion, involve any material danger of the sale, forfeiture or loss of such item of Equipment, or any interest, including the Secured Party's security interest, therein). In the event that any such law, rule, regulation or order requires alteration of any item of Equipment, unless the validity thereof is being contested in good faith and by appropriate proceedings (but only so long as such proceedings do not in the Secured Party's opinion involve any material danger of the sale, forfeiture or loss of any item of Equipment, or any interest, including the Secured Party's security interest, therein), the Grantor will obtain conformance therewith at no expense to the Secured Party and will cause such item of Equipment to be maintained in proper operating condition under such laws, rules, regulations and orders.

(b)    There are no International Interests registered with the International Registry with respect to the Aircraft or this Agreement, and the Grantor will not permit any International Interests to be filed with the International Registry except for (i) the International Interest created by the sale pursuant to which the Grantor took title to the Aircraft, (ii) the Secured Party's interest in the Aircraft or (iii) as otherwise consented to in writing by the Secured Party.

(c)     The Grantor is a Transacting User Entity (as defined in the Cape Town Convention), has appointed an Administrator and has designated a Professional User Entity (as defined in the Cape Town Convention) acceptable to the Secured Party. The Grantor has paid all fees and taken all action required by the Secured Party to enable the Secured Party to register any International Registry registrations in the Aircraft.

(d)     The Grantor hereby consents to the registration of any International Interests arising in connection with this Agreement and/or any Finance Document in favor of the Secured Party.  At closing for Loan A2, the Grantor shall authorize its Professional User Entity to consent to the registration (including all Final Consents thereto required by the Cape Town Convention) of any International Interests with the International Registry.

(e)     The Grantor shall not discharge or allow to be discharged any International Interest created in favor of the Secured Party without the Secured Party's prior written consent.

(f)     The Grantor shall not utilize the Aircraft so as to include any landings in countries other than countries that then have diplomatic relations with the United States of America.  The Grantor shall not operate the Aircraft in any country or territory where armed conflict exists unless the Aircraft is fully insured against such risks.

(g)     The Grantor agrees that it will not utilize any item of Equipment in any area excluded from coverage by the insurance required by the terms of Article 5.

**SECTION 3.3**     **Records and Reports**.  The Grantor shall cause all records, logs and other materials required by the FAA and any other governmental authority having jurisdiction to be maintained in respect of each item of Equipment.  The Grantor shall promptly furnish or cause to be furnished to the Secured Party such information as may be required to enable the Secured Party to file any reports required to be filed by the Secured Party with any governmental authority because of the Secured Party's interests in any item of Equipment.

**SECTION 3.4**     **Maintenance**.  The Grantor, at its own cost and expense, shall cause each item of Equipment to be maintained, serviced, repaired, overhauled, altered, modified, added to and tested in accordance with standard practices for similar equipment (including, without limitation, the maintenance program for such item of Equipment as from time to time in effect and approved by manufacturer and/or seller thereof, and to the extent required by law, by the FAA), which practices shall at all times be at or above the standard of the industry for maintenance of similar equipment; and, additionally, in the case of the Aircraft, cause the Aircraft to be maintained, serviced, repaired, overhauled and tested so as to keep the Aircraft in such condition as may be necessary to enable the airworthiness certification of the Aircraft to be maintained in good standing at all times under the Act.  The Grantor agrees that the Aircraft, Airframe and Engines will not be maintained in violation of any law or any rule, regulation or order of any government or governmental authority (domestic or foreign) having jurisdiction, in violation of any warranty with respect to any item of Equipment or in violation of any airworthiness certificate, license or registration relating to the Aircraft, Airframe or any Engine issued by any such government or authority, except to the extent the validity or

application of any such directive, instruction, law, rule, regulation or order is being contested in good faith and by appropriate proceedings (but only so long as such proceedings do not, in the Secured Party's opinion, involve any material danger of the sale, forfeiture or loss of such item of Equipment or any interest, including the Secured Party's security interest, therein).

**SECTION 3.5** **Replacement of Parts**. The Grantor, at its own cost and expense, will promptly cause the replacement of all Parts which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever. In addition, the Grantor, at its own cost and expense, may permit the removal in the ordinary course of maintenance, service, repair, overhaul or testing of any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use; provided, however, that the Grantor, at its own cost and expense, will cause such Parts to be replaced as promptly as possible. All replacement Parts shall be free and clear of all Liens (except for Permitted Liens described in Section 3.1), shall be in as good operating condition as, and shall have a value and utility at least substantially equal to, the Parts replaced, assuming such replaced Parts were in the condition and repair required to be maintained by the terms hereof. The Grantor's rights, title and interests in all Parts at any time removed from any item of Equipment shall remain subject to the Lien of this Agreement no matter where located, until such time as such Parts shall be replaced by Parts which have been incorporated in such item of Equipment and which meet the requirements for replacement Parts specified above. Immediately upon any replacement Part becoming incorporated or installed in or attached to any item of Equipment as above provided, without further act, (i) the Grantor's rights, title and interests in such replacement Part shall become subject to the Lien of this Agreement, and such replacement Part shall be deemed part of such item of Equipment for all purposes hereof to the same extent as the Parts originally incorporated in such item of Equipment, and (ii) the Grantor's rights, title and interests in the replaced Part shall be released from the Lien of this Agreement and the replaced Part shall no longer be deemed a Part hereunder.

**SECTION 3.6** **Alterations, Modifications and Additions**. The Grantor, at its own cost and expense, shall cause such alterations and modifications in and additions to the Equipment to be made as may be required from time to time to meet the standards of the FAA and of any other governmental authority having jurisdiction and to maintain the certificate of airworthiness for the Aircraft; provided, however, that the validity or application of any such law, rule, regulation or order may be contested in good faith by appropriate proceedings (but only so long as such proceedings do not, in the Secured Party's opinion, involve any material danger of sale, forfeiture or loss of any item of Equipment, or any interest, including the Secured Party's security interest, therein). In addition, the Grantor, at no cost or expense to the Secured Party, may, from time to time, cause such alterations and modifications in and additions to any item of Equipment to be made as the Grantor may deem desirable; provided, that each such alteration, modification and addition is readily removable from such item of Equipment; and provided, further, that no such alteration, modification or addition shall (i) materially diminish the value, utility or condition of such item of Equipment below the value, utility or condition thereof immediately prior to such alteration, modification or addition, assuming the item of Equipment was then of the value and utility and in the condition required to be maintained by the terms of this Agreement, or (ii) cause the airworthiness certification of the Aircraft to cease to be in good standing under the Act. The Grantor's rights, title and interests in all Parts added to the

Aircraft, the Airframe or an Engine as the result of such alteration, modification or addition shall, without further act, be subject to the Lien of this Agreement. Notwithstanding the foregoing sentence of this Section 3.6, so long as no Event of Default shall have occurred and be continuing, the Grantor may remove any Part if (i) such Part is in addition to, and not in replacement of or substitution for, any Part originally incorporated in such item of Equipment at the time of delivery thereof or any Part in replacement of or substitution for any such Part, (ii) such Part is not required to be incorporated or installed in or attached or added to such item of Equipment pursuant to the terms of this Article 3, and (iii) such Part can be removed from such item of Equipment without causing any material damage thereto. Upon the removal of any Part as above provided, the Grantor's rights, title and interests in such Part shall be released from the Lien of this Agreement.

SECTION 3.7    **Loaner Engines**. In the event any Engine is damaged and is being repaired, or is being inspected or overhauled, Grantor, at its option, may temporarily substitute another engine of the same make and model as the Engine being repaired or overhauled (any such substitute engine being hereinafter referred to as a "**Loaner Engine**") during the period of such repair or overhaul; provided no Event of Default or Default has occurred and is continuing and (i) installation of Loaner Engine is performed by a maintenance facility certified by the FAA and manufacturer with respect to an aircraft of this type, (ii) Loaner Engine is removed, and the repaired or overhauled original Engine is reinstalled on the Airframe promptly upon completion of the repair or overhaul but in no event later than the earlier of ninety (90) days after removal or the occurrence of an Event of Default, and (iii) Loaner Engine is free and clear of any Lien that might impair Secured Party's rights or interests in the Aircraft and is maintained in accordance herewith.

SECTION 3.8    **Maintenance of Other Engines**. Each aircraft engine which does not constitute an Engine, but which is installed on the Airframe from time to time, shall be maintained, operated, serviced, repaired, overhauled, altered, modified and tested in accordance with Section 3.4 to the same extent as if it were an Engine.

SECTION 3.9    **Payment of Obligations**. The Grantor hereby agrees that it will promptly pay or cause to be paid when due all taxes, assessments and other governmental charges imposed with respect to the Collateral (except to the extent being contested in good faith and by appropriate proceedings).

SECTION 3.10    **Change of Name or Location**. In connection with any change of the name, identity or structure of the Grantor that might make the UCC financing statements filed in connection with the transactions contemplated hereby seriously misleading within the meaning of the UCC or any change in the location of the Grantor or the jurisdiction of organization of the Grantor, the Grantor shall give the Secured Party notice of such change at least 10 Banking Days prior to such change.

SECTION 3.11    **Inspection**. The Grantor shall permit, at its expense, the Secured Party or any Person designated by the Secured Party to inspect (i) the Aircraft; provided, however, that as long as no Event of Default has occurred and is continuing, the Secured Party shall not exercise such inspection rights more than once a year or in such a way so as to

unreasonably interfere with the Grantor's use of the Aircraft and (ii) the logs, maintenance records and other records maintained with respect to the Aircraft.

## ARTICLE 4

## EVENTS OF LOSS

SECTION 4.1        **Event of Loss with Respect to the Aircraft**.  Upon the occurrence of an Event of Loss with respect to the Aircraft, the Grantor shall give the Secured Party prompt written notice thereof (and in any event within three Banking Days after such occurrence), and the Grantor shall, on or before the Banking Day which is the earliest of (i) the thirtieth (30th) day following the date of the occurrence of such Event of Loss, or (ii) the next Banking Day following the receipt of insurance proceeds with respect to such occurrence, pay to the Secured Party the Loss Value.  In the event of payment in full by the Grantor of the appropriate Loss Value and all other amounts then due and payable hereunder and under any other Finance Document, the Grantor's rights, title and interest in the Aircraft having suffered the Event of Loss shall be released from this Agreement and the Secured Party shall execute and deliver, at the Grantor's cost and expense, such instruments as may be reasonably required to evidence such release.

SECTION 4.2        **Event of Loss with Respect to an Engine or APU**.  Upon the occurrence of an Event of Loss with respect to any Engine or APU, the Grantor shall give the Secured Party prompt written notice thereof (and in any event within three Banking Days after such occurrence), and the Grantor shall, as soon as possible, but no later than thirty (30) days following the date of the occurrence of such Event of Loss either:

> (a)        pay to the Secured Party the Loss Value; or

> (b)        enter into, at the expense of the Grantor, an agreement in all respects satisfactory to the Secured Party, for the purchase of a new Engine or APU, as the case may be, of the same make, model and specifications as the Engine or APU, as the case may be, subject to the Event of Loss in order to enable the Grantor to promptly replace the Engine or APU, as the case may be, subject to such Event of Loss.  Upon delivery of any such new Engine or APU, as the case may be, pursuant to such agreement, the Grantor shall cause any such new Engine or APU, as the case may be, to be installed on the Aircraft and specifically subject such new Engine or APU, as the case may be, to the Lien hereof by delivering to Secured Party all documents and instruments to effectuate such Lien as the Secured Party may reasonably request.

In the event of payment in full by the Grantor of the appropriate Loss Value and all other amounts then due and payable hereunder and under any other Finance Document, the Grantor's rights, title and interest in the Engine or APU, as the case may be, having suffered the Event of Loss and the Aircraft shall be released from this Agreement and the Secured Party shall execute and deliver, at the Grantor's cost and expense, such instruments as may be reasonably required to evidence such release.

11

SECTION 4.3     **Application of Payments from Governmental Authorities or other Persons**.  Any payments (other than insurance proceeds, the application of which is provided for in Article 5 or Section 4.2), received at any time by the Secured Party or the Grantor from any governmental authority or other Person with respect to any Event of Loss, or from a governmental authority with respect to an event which does not constitute an Event of Loss, shall be applied as follows:

(a)     **Reduction of Loss Value**.  Such payments shall be applied in reduction of the Grantor's obligation to pay the Loss Value, if not already paid by the Grantor, or, if already paid by the Grantor, shall be applied to reimburse the Grantor for its payment of such amounts.  The balance, if any, of such payment remaining thereafter, and after payment of all amounts then due and payable under the Finance Documents, shall be paid to the Grantor.

(b)     **Use of Aircraft Not Constituting an Event of Loss**.  If such payments are received with respect to a requisition for use by the government which does not constitute an Event of Loss, such payments may be retained by the Grantor.

(c)     **Payments During Default**.  Notwithstanding the foregoing provisions of this Section 4.3, any payments (other than insurance proceeds, the application of which is provided for in Article 5) received at any time by the Secured Party from any governmental authority or other Person with respect to any Event of Loss, which are payable to the Grantor, shall not be paid to the Grantor if at the time of such payment an Event of Default or Default shall have occurred and be continuing, in which event all such amounts shall be paid to and held by the Secured Party as security for the Obligations or, at the Secured Party's option, applied by the Secured Party toward the payment of such Obligations at the time due in such order of application as the Secured Party may from time to time elect.  At such time as there shall not be any Event of Default or Default, all such amounts at the time held by the Secured Party in excess of the amount, if any, which the Secured Party shall have elected to apply as above provided shall be paid to the Grantor.

In furtherance of the foregoing, the Grantor hereby irrevocably assigns, transfers and sets over to the Secured Party all rights of the Grantor to any award or payment received by or payable to the Grantor on account of an Event of Loss.

## ARTICLE 5

### INSURANCE

SECTION 5.1     **Insurance**.  The Grantor shall, at all times, at its own cost and expense, comply with its covenants under clause 18.14 (Insurance) of the Facility Agreement.

SECTION 5.2     **Certificates of Insurance**.  Prior to making Loan A2 and, (if required by the Secured Party) at least three full Banking Days prior thereto, the Secured Party shall have received evidence as to the insurance coverage required under this Agreement, including, but not limited to, a certificate of insurance, copies of endorsements (including a

Secured Party endorsement), and, if requested by the Secured Party, copies of applicable policies and written confirmation from the insurance underwriter or broker that the insurance coverage provided is in compliance with the requirements of Section 5.1 of this Agreement. At least ten (10) days prior to the policy expiration date for any insurance coverage required by Section 5.1, the Grantor shall furnish to the Secured Party evidence (in form and substance satisfactory to the Secured Party) of the renewal or replacement of such coverage, complying with the terms hereof, for a twelve (12) month or greater period commencing from and after such expiration date until the Obligations secured hereby are paid in full.

**SECTION 5.3      Proceeds of Insurance.** Any proceeds of insurance received by the Secured Party as a result of an Event of Loss with respect to the Aircraft or any Engine, shall be applied to reduce the Grantor's obligation to pay the Loss Value, if not already paid by the Grantor, or, if already paid by the Grantor, shall be paid over to the Grantor; provided, however, that if a Default or an Event of Default shall have occurred and be continuing, such proceeds shall be held by the Secured Party as security for the Obligations or, at the Secured Party's option, applied to the payment of the Obligations in such order as the Secured Party may from time to time elect. In the event of any damage to, or loss, theft or destruction of, the Aircraft or any Engine by any cause whatsoever not involving an Event of Loss, all insurance proceeds in respect thereof shall be paid to the Grantor in trust for the repair and restoration of the Aircraft to good repair, condition and working order.

## ARTICLE 6

## REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT

**SECTION 6.1      Action upon Event of Default.** Upon the occurrence of an Event of Default described in clause 19.5 (*Insolvency*), clause 19.6 (*Insolvency proceedings*) or clause 19.7 (*Creditors' process*) of the Facility Agreement, unless the Secured Party should otherwise agree, the commitment of the Secured Party to make Loan A2 shall automatically and without further act terminate and the unpaid principal of (and indemnification for funding losses, if any) and accrued interest on Loan A2 and all other amounts due and payable under this Agreement and the other Finance Documents shall automatically and without further act become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, anything contained herein or in any other Finance Document to the contrary notwithstanding, and the Secured Party may immediately exercise and pursue any remedy described herein or otherwise available to it in any Finance Document, at law, in equity or by statute (subject always to compliance with any mandatory requirements of Applicable Law). If any other Event of Default shall have occurred and be continuing, the Secured Party may, at its option, declare the commitment of the Secured Party to make Loan A2 to be terminated and the unpaid principal of (and indemnification for funding losses, if any) and accrued interest on Loan A2 and all other amounts due and payable under this Agreement and the other Finance Documents to be forthwith due and payable, whereupon such commitment shall immediately terminate and Loan A2 and such other amounts shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein or in any other Finance Document to the contrary notwithstanding; and the Secured Party may immediately exercise and pursue any remedy described herein or otherwise available to it in any Finance Document, at law, in equity or by

statute (subject always to compliance with any mandatory requirements of Applicable Law). Upon such declaration, the Secured Party may exercise any or all of the rights and powers and pursue any or all of the remedies permitted by this Article 6.

**SECTION 6.2** **Remedies**. The Grantor agrees, to the full extent that it lawfully may, that if one or more Events of Default shall have occurred and be continuing, then in every such case the Secured Party may exercise any or all of the rights and powers and pursue any and all of the remedies available to it hereunder or in any other Finance Document or available to a secured party under the Uniform Commercial Code or any other provision of law or equity, including, without limitation, the Cape Town Convention; the Secured Party may exclude the Grantor from the Collateral; and the Secured Party may sell, assign, transfer and deliver, to the extent permitted by law, the Collateral or any interest therein, whether or not the Collateral is in the constructive possession of the Secured Party or the Person conducting the sale, at any private sale or public auction with or without demand, advertisement or notice (except as may be required by law) of the date, time and place of sale and any adjournment thereof, for cash or credit or other property, for immediate or future delivery and for such price or prices and on such terms and to such Persons as the Secured Party in its discretion may determine or as may be required by law; and the Secured Party may otherwise dispose of, hold or use the Collateral, or any part thereof, as the Secured Party in its sole discretion may determine, in each case free and clear of any rights of the Grantor and without any duty to account to the Grantor with respect to any such action or inaction or for any proceeds with respect thereto. It is agreed that 10 days' notice to the Grantor of the date, time and place (and terms, in the case of a private sale) of any proposed sale by the Secured Party of the Collateral or any part thereof or interest therein is reasonable.

The Secured Party may proceed to enforce its rights by directing payment to it of all monies payable under any agreement relating to the Collateral, by proceedings in any court of competent jurisdiction for an appointment of a receiver or for the sale of all or any part of the Collateral possession to which the Secured Party shall at the time be entitled hereunder or for foreclosure of such Collateral, or by any other action, suit, remedy or proceeding authorized or permitted by this Agreement or at law or by equity, and may file such proofs of claim or other papers or documents as necessary or advisable in order to have the claims of the Secured Party asserted or upheld in any bankruptcy, receivership or other judicial case or proceeding.

In addition to the foregoing remedies, the Grantor shall be liable for any and all unpaid amounts due hereunder and under the other Finance Documents before, during and after the exercise of any of the foregoing remedies and for all reasonable legal fees and other reasonable costs and expenses of the Secured Party, including, without limitation, attorneys' fees and legal expenses, incurred by reason of the occurrence of any Event of Default or the exercise of any remedies with respect thereto.

**SECTION 6.3** **Remedies Cumulative**. Each and every right, power and remedy herein specifically given to the Secured Party or otherwise in this Agreement or the other Finance Documents shall be cumulative and shall be in addition to every other right, power and remedy herein or therein specifically given or now or hereafter existing at law (including the Cape Town Convention), in equity or by statute, and each and every right, power and remedy whether specifically herein or therein given or otherwise existing may be exercised from time to

time and as often and in such order as may be deemed expedient by the Secured Party, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy. No delay or omission by the Secured Party in the exercise of any right, power or remedy or in the pursuit of any remedy shall impair any such right, power or remedy or be construed to be a waiver of any default on the part of the Grantor to be an acquiescence therein.

SECTION 6.4    **Grantor's Waiver of Rights.**    To the extent permitted by Applicable Law, the Grantor hereby waives any rights, now or hereafter conferred by statute or otherwise, which might limit or modify any of the rights or remedies of the Secured Party under or in connection with this Article 6.

SECTION 6.5    **Power of Attorney.**    The Grantor hereby appoints the Secured Party or its designated agent as such Grantor's attorney-in-fact, irrevocably, with full power of substitution, to collect all payments with respect to the Collateral due and to become due under or arising out of this Agreement or any other Finance Document, to receive all moneys (including, but not limited to, proceeds of insurance) which may become due under any policy insuring the Collateral and all awards payable in connection with the condemnation, requisition or seizure of the Collateral, or any part thereof, to execute proofs of claim, to endorse drafts, checks and other instruments for the payment of money payable to the Grantor in payment of such insurance moneys and to do all other acts, things, take any actions (including the filing of financing statements, FAA filings, Cape Town Convention registrations or other documents) or institute any proceedings which the Secured Party may deem to be necessary or appropriate at any time to protect and preserve the interest of the Secured Party in the Collateral, or in this Agreement or the other Finance Documents.

SECTION 6.6    **Distribution of Amounts Received after an Event of Default.** All payments received and amounts realized by the Secured Party with respect to the Collateral after an Event of Default shall have occurred and be continuing (whether realized from the exercise of any remedies pursuant to this Article 6 or otherwise), as well as payments or amounts then held by the Secured Party as part of the Collateral, shall be distributed by the Secured Party in the following order of priority:

First, so much of such payments and amounts as shall be required to pay the expenses paid by the Secured Party pursuant to this Article 6 (to the extent not previously reimbursed) shall be paid to the Secured Party;

Second, so much of such payments or amounts as shall be required to pay the amounts payable to any Indemnified Party (to the extent not previously reimbursed) shall be paid to such Indemnified Party;

Third, so much of such payments or amounts remaining as shall be required to pay in full the aggregate unpaid principal amount of Loan A2 (on a pro rata basis), the accrued but unpaid interest thereon to the date of distribution, indemnification for funding losses, if any, and all other Obligations, shall be paid to the Secured Party; such payments or amounts to be applied to the amounts so due, owing or unpaid in such order of application as the Secured Party may from time to time elect; and

Fourth, the balance, if any, of such payments or amounts remaining thereafter shall be paid to the Grantor.

**SECTION 6.7** **Suits for Enforcement**. In case of any default in payment of Loan A2 beyond any applicable grace period, then, regardless of whether or not Loan A2 has then been accelerated, the Secured Party may proceed to enforce the payment of Loan A2. The Grantor agrees that, in the case of any default in the payment of Loan A2, it will pay the Secured Party such further amount as shall be sufficient to pay the costs and expenses of collection, including reasonable counsel fees and expenses.

## ARTICLE 7

## AMENDMENTS

**SECTION 7.1** **Amendments**. Neither this Agreement, nor any of the terms hereof, may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing which is signed by the party against whom the enforcement of the termination, amendment, supplement, waiver or modification is sought.

## ARTICLE 8

## SECURITY INTEREST ABSOLUTE

**SECTION 8.1** **Security Interest Absolute**. All rights of the Secured Party and the security interests granted to the Secured Party hereunder, and all obligations of the Grantor hereunder, shall be absolute and unconditional, irrespective of:

(a)    any lack of validity or enforceability of any Finance Document;

(b)    the failure of the Secured Party to

(i)    assert any claim or demand or to enforce any right or remedy against the Grantor or any other Person under the provisions of the Facility Agreement any other Finance Document or otherwise; or

(ii)    to exercise any right or remedy against any guarantor of, or collateral securing, any of the Obligations;

(c)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other extension, compromise or renewal of any of the Obligations;

(d)    any reduction, limitation, impairment or termination of any of the Obligations for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and the Grantor hereby waives any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any of the Obligations;

     (e)    any amendment to, rescission, waiver, or other modification of, or any consent to departure from, any of the terms of the Facility Agreement or any other Finance Document,

     (f)    any addition, exchange, release, surrender or nonperfection of any collateral (including the Collateral), or any amendment to or waiver or release of or addition to or consent to departure from any guaranty, for any of the Obligations; or

     (g)    any other circumstances which might otherwise constitute a defense available to, or a legal or equitable discharge of, the Grantor, any surety or any guarantor.

## ARTICLE 9

### MISCELLANEOUS

**SECTION 9.1**     **GOVERNING LAW. THIS AGREEMENT IS BEING DELIVERED IN THE STATE OF NEW YORK. THIS AGREEMENT, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.**

**SECTION 9.2**     **Notices**.  All notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as the Secured Party and the Grantor may specify from time to time in writing.  Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

**SECTION 9.3**     **Limitation as to Enforcement of Rights, Remedies and Claims**. Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Grantor and the Secured Party any legal or equitable right, remedy or claim under or in respect of this Agreement or any other Finance Document.

**SECTION 9.4**     **Severability of Invalid Provisions**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such provision, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**SECTION 9.5**     **Benefit of Parties, Successors and Assigns; Entire Agreement**. All representations, warranties, covenants and agreements contained herein or delivered in connection herewith shall be binding upon, and inure to the benefit of, the Grantor and the Secured Party and their respective legal representatives, successors and assigns; provided,

however, that the Grantor may not assign its obligations hereunder. This Agreement, together with the other Finance Documents, constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior understandings and agreements of such parties.

**SECTION 9.6**    **Counterpart Execution**. This Agreement and any amendment to this Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when so executed and delivered, shall be an original, but all such counterparts shall together constitute but one and the same instrument. Fully executed sets of counterparts shall be delivered to, and retained by, the Grantor and the Secured Party.

**SECTION 9.7**    **Further Assurances**. At any time and from time to time, upon the request of the Secured Party, the Grantor shall promptly and duly execute and deliver any and all such further instruments and documents as may be specified in such request, and as are necessary or desirable to perfect, preserve or protect the security interests and assignments created or intended to be created hereby, or to obtain for the Secured Party the full benefit of the specific rights and powers herein granted, including, without limitation, the execution and delivery of Uniform Commercial Code financing statements and continuation statements with respect thereto, Cape Town Convention registrations or similar instruments relating to the perfection of the mortgage, security interests or assignments created or intended to be created hereby.

**SECTION 9.8**    **Performance by Secured Party**. In its discretion, the Secured Party may (but shall not be obligated to), at any time and from time to time (regardless of whether or not an Event of Default has occurred), for the account of the Grantor, pay any amount or do any act required of the Grantor hereunder and which the Grantor fails to pay or do at the time required hereunder, and any such payment shall be repayable by the Grantor on demand to the Secured Party, shall bear interest at the interest rate required under the Facility Agreement and shall be secured by the Collateral.

**SECTION 9.9**    **Indemnity**. The Grantor agrees to indemnify the Secured Party from and against any and all claims, losses and liabilities arising out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting from the Secured Party's gross negligence or willful misconduct.

**SECTION 9.10**    **Consent to Jurisdiction**. To induce the Secured Party to accept this Agreement, the Grantor irrevocably agrees that, subject to the Secured Party's sole and absolute election, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT WILL BE LITIGATED IN COURTS HAVING SITUS IN THE COUNTY OF NEW YORK IN NEW YORK CITY, NEW YORK. THE GRANTOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN THE COUNTY OF NEW YORK IN NEW YORK CITY, NEW YORK. NOTWITHSTANDING ANYTHING IN THE FOREGOING TO THE CONTRARY, THE GRANTOR AND THE LENDER MAY BRING A JUDICIAL PROCEEDING AGAINST THE REGISTRAR OF THE INTERNATIONAL REGISTRY IN THE REPUBLIC OF IRELAND, SOLELY TO THE EXTENT SUCH PROCEEDING SEEKS RELIEF FROM THE INTERNATIONAL REGISTRY.

**SECTION 9.11**     <u>Waiver of Jury Trial</u>. THE GRANTOR AND THE LENDER EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (a) UNDER THIS AGREEMENT OR ANY FINANCE DOCUMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR ANY FINANCE DOCUMENT OR (b) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE GRANTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

**SECTION 9.12**     <u>Service of Process</u>. The Grantor hereby irrevocably appoints CT Corporation for the service of process in any action or proceeding referred to in Section 9.10 by the mailing thereof by certified mail, return receipt requested, addressed to 111 Eighth Avenue, New York, New York 10011, and hereby waives personal service of process upon the Grantor.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties have each executed this Agreement, as of the date set forth above.

GRANTOR:

HELI USA AIRWAYS, INC.

By: _____

Name: Nigel Turner

Title: President & CEO.

Address: 235 E. Tropicana Ave., #115

Las Vegas, NV 89169

Telecopier: (702) 736-4488

LENDER:

INTESA SANPAOLO S.P.A.,
      NEW YORK BRANCH

By: _____

Name: _____

Title: _____

Address: _____

_____

Attention: _____

Telecopier: (___) ___-_____

with a copy to:

[                              ]
[                              ]

EAST\47731103.2

26

**IN WITNESS WHEREOF**, the parties have each executed this Agreement, as of the date set forth above.

**GRANTOR:**

**HELI USA AIRWAYS,INC.**

By:_____

Name:_____

Title:_____

Address:_____

_____

Telecopier: _____

**LENDER:**

**INTESA SANPAOLO S.P.A.,**
**NEW YORK BRANCH**

By_____

Name: *Pastorino, VP      A. DiMaggio, VP*

Title:_____

Address: One William Street
New York, New York 10004

Attention: Mr. Roberto Carvalho, Analyst
Telecopier: (212) 607-3732

with a copy to:

[_____]
[_____]

20

Attention: [_____]
Telecopier: [_____]

**SACE AGENT:**

**INTESA SANPAOLO S.P.A.,
    LONDON BRANCH**

By:_____
Name:_____
Title:_____
           Andrea Contardo
           Assistant General Manager

Address: Loan Administration and Agency Dept.
        90, Queen Street
        London EC4N 1SA, United Kingdom
Attention: Mr. Giovanni Monaco
Telecopier: (___) ____-_____

Alessia Picci
Manager, Loans
and Agency Dept

with a copy to:

[_____]
[_____]
Attention: [_____]
Telecopier: [_____]

**ARRANGER:**

**INTESA SANPAOLO S.P.A.,
    MILAN BRANCH**

By:_____
Name:_____
Title:_____

Address:_____
         _____
         _____
Attention:_____
Telecopier: (___) ____-_____

with a copy to:

Attention: [_____]
Telecopier: [_____]

SACE AGENT:

INTESA SANPAOLO S.P.A.,
    LONDON BRANCH

By:_____
Name:_____
Title:_____

Address:_____
          _____
          _____
Attention:_____
Telecopier: (___) ____-_____

with a copy to:

[_____]
[_____]
Attention: [_____]
Telecopier: [_____]

ARRANGER:

INTESA SANPAOLO S.P.A.

By: _Urluce_ · _K. S_
Name: M. SIMEONI        K. COTAS
Title: DIRECTOR        HEAD OF STRUCTURED
                               EXPORT FINANCE
Address: Structured Export Finance
         Piazza della Scala, 6
         20121 Milano
Attention: Mrs Maria Simeoni
Telecopier: (___) ____-_____

with a copy to:

[_____]
[_____]
Attention: [_____]
Telecopier: [_____]